# IN THE COURT OF APPEALS OF IOWA

No. 23-1114
Filed July 3, 2024

**IN RE THE MARRIAGE OF COLLEEN MARIE CREESE
AND PHILLIP MOIN CREESE, JR.**

**Upon the Petition of
COLLEEN MARIE CREESE,**
      Petitioner-Appellee/Cross-Appellant,

**And Concerning
PHILLIP MOIN CREESE, JR.,**
      Respondent-Appellant/Cross-Appellee.
_____

      Appeal from the Iowa District Court for Dallas County, Stacy Ritchie, Judge.


      A husband appeals from the property-division provisions in a decree dissolving the parties' marriage, and the wife cross-appeals as to physical care of their child. **AFFIRMED ON APPEAL AND CROSS-APPEAL.**


      Delaney J. Kozlowski of Sease & Wadding, Des Moines, for appellant/cross-appellee.

      Katie M. Naset of Hope Law Firm & Associates, P.C., West Des Moines, for appellee/cross-appellant.


      Considered by Badding, P.J., Langholz, J., and Bower, S.J.*

      *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**BADDING, Presiding Judge.**

Phillip Creese appeals, and Colleen Creese cross-appeals, the decree dissolving their eight-year marriage. Phillip claims the district court erred in valuing the marital home and his inherited interest in it, while Colleen challenges the court's decision to place the parties' minor child in their joint physical care. She also requests an award of appellate attorney fees. We deny that request and affirm the court's decree.

## I.     Physical Care

Addressing Colleen's cross-appeal first, we find from our de novo review of the record[1] that Phillip and Colleen married in May 2015. At the time of their marriage, Colleen had three children from prior relationships. The couple then had one child together, K.C., who was born in 2018.

Colleen petitioned to dissolve the marriage in April 2022. She was forty-three years old and employed as the vice president of implementation services for an insurance risk management company, where she grossed $110,000 per year plus bonuses. Phillip was forty years old and managed a trucking company, earning $75,000 gross per year. He also earned $2000 to $3000 per year from umpiring softball games. During the "umpiring season," Colleen provided more of the nighttime care for K.C., especially when he was younger. Otherwise, the record shows the parties jointly cared for the child.

---

[1] "In an equity action, such as a dissolution of marriage, our review is de novo." *In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021); *accord* Iowa R. App. P. 6.907. "We give weight to the findings of the district court, particularly concerning the credibility of witnesses; however, those findings are not binding upon us." *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013).

Colleen stayed in the marital home until July, when she and K.C. moved into a rental in a nearby town. Colleen's three other children were adults at the time. After Colleen applied for a hearing on temporary matters, the district court entered an order placing K.C. in their joint physical care. The court continued that arrangement after the dissolution trial in May 2023. Colleen's primary argument against joint physical care—at the temporary hearing, dissolution trial, and on appeal—centers on Phillip's habit of "leaving unsecured firearms in the home."

Phillip is a gun enthusiast. He owns nine guns, including two AR-15 rifles, a couple of shotguns, and a few pistols. At the temporary hearing, Colleen introduced pictures of guns scattered throughout their house in the years after K.C. was born. One showed a rifle on the kitchen table. Others showed rifles propped against the walls in their bedroom. And yet another showed a handgun on the kitchen table next to a box of cookies. In one picture, which Phillip said "hurt[] his heart to look at," he was sitting on the couch, pointing a handgun across the room while K.C. was playing on the ground nearby. These pictures prompted the district court to include the following provision in bold type in the temporary order:

> When [K.C.] is in Phillip's care <u>all</u> firearms shall be securely stored in a locked case or cabinet or otherwise made <u>completely inaccessible</u> to [K.C.]

Despite this clear directive, Phillip admitted that he left the gun safe in the basement open when Colleen's adult daughter was at the house gathering some of her things. Phillip justified that violation of the temporary order by testifying, "there was nobody in the home at that time." He also admitted that he did not put his "personal carry" gun in the safe. Instead, Phillip said "[i]t goes in, on a storage

cabinet where [K.C.] cannot reach." He acknowledged that cabinet was not locked, but he testified the gun was not loaded.

These justifications fall flat. We agree with Colleen that Phillip's actions pose a serious risk for the child's safety. Colleen testified that she discussed this unacceptable risk with Phillip, but "he doesn't feel that [K.C.] is strong enough to pull the trigger on a gun. . . . That was even after showing him evidence of children, even in this state, in a neighboring county recently that shot herself." Her fears for the child's safety were heightened because of K.C.'s curiosity about guns. Colleen testified, "[M]y child . . . routinely talks about shoot[ing] guns. And kids have a natural curiosity; I want my child to be safe." Phillip understood Colleen's concerns, but he testified that he never "had a loaded weapon anywhere near [K.C.] when he could get to it."

The district court shared Colleen's concerns, finding:

> [T]he Court is charged with determining the safety and best interests of [K.C.] Firearms, including semi-automatic or automatic assault rifles, left around the house in places of easy access to a four-year-old child pose a high risk to the safety of that child. . . . A parent who is a gun enthusiast must balance his hobby with the safety of any child entering the residence. . . . Colleen testified that . . . their four-year-old son is very interested in the firearms that are Phillip's hobby. This elevated level of curiosity of [K.C.] only increases the risk of accidental injury to the child or another person from a firearm.

See Iowa Code § 598.41(3)(i) (considering the "safety of the child"); *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007) ("The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity.").

Yet it is clear from the record that "Phillip is a loving and caring father," as the court found. Colleen concedes they both "actively cared" for K.C. during their marriage, and she wants Phillip to remain an active part of the child's life. *See Hansen*, 733 N.W.2d at 697–98 ("[J]oint physical care is most likely to be in the best interest of the child where both parents have historically contributed to physical care in roughly the same proportion."). Each described the other as a good parent. And they were, for the most part, supportive of one another's relationship with the child. *See* Iowa Code § 598.41(3)(e) (considering whether each parent can support the other's relationship with the child). Colleen typically had a video chat with K.C. "every night Phil has him,"[2] and Phillip did the same when the child was in her care, with both recognizing that K.C. missed the other parent when he was not in that parent's care. They worked together to care for K.C. during times when the other parent was out of town and, in Phillip's view, they communicated well with one another. *See Hansen*, 733 N.W.2d at 698 (factoring in the ability of spouses to communicate and the degree of conflict between them). The text messages between the parties support his testimony.

In the end, we agree with the district court that "[t]o restrict contact between Phillip and [K.C.] would cause [K.C.] psychological and emotional harm" and that joint physical care is in the child's best interests. *See In re Marriage of Williams*, 589 N.W.2d 759, 762 (Iowa Ct. App. 1998) ("The emotional stability

---

[2] Phillip acknowledged that he denied Colleen contact with the child one time before the trial, which he regretted. *See In re Marriage of Meierotto*, No. 15-0047, 2015 WL 5968895, at *4 (Iowa Ct. App. Oct. 14, 2015) (agreeing with the district court that occasional improper conduct should not overshadow the parenting characteristics the parties exhibited over several years).

associated with maintaining the parent-child relationship is primary to the best interests of the child.").  But the court's warning and order bears repeating:

> It would be catastrophic to this entire family if [K.C.] got ahold of a firearm and someone was injured.  Gun safety by Phillip is paramount to the best interests of [K.C.] and should be paramount in exercising his right to possess firearms.
> . . . .
> Phillip shall secure any and all ammunition and firearms including but not limited to assault rifles, rifles, shotguns, and handguns, in a locked gun safe at all times when [K.C.] is present in his residence or, if in a car, in a locked gun case at all times when [K.C.] is present in his car until such time as [K.C.] has successfully completed a gun safety course AND the parties agree that [K.C.] is old enough to safely be in the presence of such weapons.

If the safety of his child and others were not sufficient motivation already, we caution Phillip that any violation of this provision could lead to a change in custody.

## II. Property Division

Moving onto Phillip's appeal, he claims the district court made two errors in its property division: "grossly overestimat[ing] the value of the [marital] home and miscalculat[ing] the equalization payment owed to Colleen."  When reviewing the division of property, "we accord the trial court considerable latitude" and will disturb its ruling "only when there has been a failure to do equity."  *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005) (citations omitted).  We find no such failure here.

When the couple married in May 2015, they were living in Colleen's house. Colleen sold that house in December, and the family moved into Phillip's childhood home, situated on a 1.2 acre-lot in Dallas County.  Phillip and his two sisters had each inherited a one-third interest in the property after their father's death.  Colleen recalled that they met with Phillip's sisters at a restaurant to "hammer out the

details" of their desired move. After considering "repairs and things that needed to be done" on the home, the family agreed that Phillip and Colleen would buy it for $75,000.

Their agreement was set out in a real estate contract that Phillip, his sisters, and all their spouses signed. The contract required Phillip and Colleen to make a down payment of $25,000, which was Phillip's one-third interest in the home. The remaining $50,000 was to be paid in equal monthly installments to the sisters. After Colleen sold her home in February or March 2016, she paid $3500 to each of the sisters. The couple continued to make monthly payments on the contract from their joint bank account until it was paid off in July 2020.

From the time they moved in until Colleen moved out in July 2022, the couple worked on renovating the home. Colleen explained:

> Every room in that house needed updating. It was buil[t] in the 70s and had not had a lot of updates to it. So we redid bedrooms, carpeting, added doors, put on a deck, updated windows, whole new front door, flooring, paint everything. So every room in that home, plus part of the basement—every room in that home with the exception of the dining and kitchen has been updated since we've owned it.

The couple did most of the work themselves, paying for things as they went along out of marital funds and insurance proceeds. Colleen kept track of the renovation costs over the years, which totaled $82,573.35 by the dissolution trial in May 2023.

Colleen had a real estate agent perform a comparative market analysis on the home a few days before the trial. While she did not introduce the analysis into evidence, Colleen testified the agent valued the home at $300,000. Phillip, on the other hand, testified the house was only worth its assessed value of $190,000.

The district court sided with Colleen, finding the "value assessed to a property for tax purposes is often much lower than the fair market value of a property. Accordingly, the Court finds the testimony that the market value as assessed by a realtor of $300,000.00 is the more credible evidence of the value of this asset." And although Phillip urged "that one third of the home is not marital property because he and his two sisters inherited the home from his father," the court found that division would not be equitable:

> At the time of the inheritance, the beneficiaries, Phillip and his sisters, established an inheritance value to each of them of $25,000.00. Accordingly, the Court finds it is equitable to award the $25,000.00 value of his inheritance to Phillip. Additionally, the $7,000.00 payment made by Colleen toward the purchase of the house came from the sale of premarital property she owned. The Court finds that amount should not be included in the marital estate for division. The increase in the value of the house was created by the joint financial investment and efforts of both Phillip and Colleen. As such, both parties should benefit from the equity created in the home beyond their initial investments.

Phillip challenges these findings which, when considered with the rest of the property division, resulted in him owing Colleen a $136,957 equalization payment.

Starting with the value of the marital residence, Phillip argues the court should not have adopted Colleen's valuation because it "was not within the permissible range of evidence, supported by credible evidence, or reasonable and fair." *See Hansen*, 733 N.W.2d at 703 ("Ordinarily, a trial court's valuation will not be disturbed when it is within the range of permissible evidence."). He particularly objects to the lack of evidence corroborating Colleen's testimony about its value. But our supreme court has said that, in "ascertaining the value of property, its owner is a competent witness to testify to its market value." *Id.* (finding the court's valuation of the marital residence was within the range of the evidence based on

the wife's valuation "in her financial affidavit and in trial testimony"). And, as Colleen points out, the actual assessed value of the property is $219,750. The $190,000 value relied on by Phillip is only for the house itself, without accounting for the land it sits on or the shed on the property. Because the court's valuation was within the range of the evidence, we decline to disturb it on appeal.

Phillip next argues the district court miscalculated the share of the marital residence that should have been set aside to him as inherited property. Iowa Code section 598.21(5) (2022) requires the court to "divide all property, except inherited property or gifts received or expected by one party, equitably between the parties." Inherited property is typically "awarded to the individual spouse who owns the property, independent from the equitable distribution process." *Schriner*, 695 N.W.2d at 496; *accord* Iowa Code § 598.21(6). But "this exclusion is not absolute." *Schriner*, 695 N.W.2d at 496. "Iowa has a unique hybrid system that permits the court to divide inherited property if equity" so demands. *Id.* That system is set out in section 598.21(6), which provides that inherited property "is not subject to a property division under this section except upon a finding that refusal to divide the property is inequitable to the other party or to the children of the marriage."

The district court determined it was equitable to set aside $25,000 from the value of the house to Phillip as inherited property. Phillip contends the court should have instead set aside a "one-third share of the property" because he "did not inherit $25,000 cash when his father passed away but rather, he inherited a one-third (1/3) *share*." He analogizes this situation

> to an individual who inherits shares in a corporation. If Phil and his sisters each inherited 25,000 shares, the value of Phil's shares, and thus the value of his inheritance, would be determined at the time of

dissolution when the value is currently relevant, not the value years beforehand when he received the shares.

Not necessarily.

Our supreme court has held that the appreciation of an inheritance "may be characterized as marital property." *In re Marriage of White*, 537 N.W.2d 744, 746 (Iowa 1995) (holding that inherited property may be set off based on the property's value at the time it was received rather than its value at trial). "When deciding whether to divide appreciation on inherited property, we must determine whether the appreciation which occurred during the marriage was fortuitous or due to the efforts of the parties." *In re Marriage of Richards*, 439 N.W.2d 876, 882 (Iowa Ct. App. 1989); *cf. In re Marriage of Fennelly*, 737 N.W.2d 97, 104 (Iowa 2007) (stating in a fifteen-year marriage, it is not appropriate when dividing premarital property "to emphasize *how* each asset appreciated—fortuitously versus laboriously"). This consideration tracks with the factors considered in determining whether it would be inequitable to exclude inherited property from the marital estate, including "contributions of the parties toward the property, its care, preservation or improvement" and "separate contributions by the parties to their economic welfare to whatever extent those contributions preserve the property for either of them." *In re Marriage of Goodwin*, 606 N.W.2d 315, 319 (Iowa 2000) (citation omitted). Other factors include the length of the marriage and the length of the time the property was held after it was devised. *In re Marriage of Thomas*, 319 N.W.2d 209, 211 (Iowa 1982).

While this was not a long marriage, the parties lived in the home for most of their marriage. *See In re Marriage of Geil*, 509 N.W.2d 738, 741 (Iowa 1993)

(dividing farm property inherited by the wife where it had served as the family homestead and provided their livelihood for many years). They both contributed to its purchase, upkeep, and improvements. *See In re Marriage of Friedman*, 466 N.W.2d 689, 693 (Iowa 1991) (noting courts have "divided the appreciated value of assets even when separately held where the increase resulted from the talent, time and effort of the marital partners"). We agree with the district court that the "joint efforts of the parties increased the value of this asset considerably and it is the primary asset to which the parties contributed during the marriage." As a result, we conclude the court acted equitably in setting aside $25,000 from the value of the home to Phillip,[3] rather than one-third of its $300,000 value. *See In re Marriage of Calhoun*, No. 13–0697, 2014 WL 250240, at *3 (Iowa Ct. App. Jan. 23, 2014) (awarding husband part of increase in value of wife's gifted farmland because of the husband's "contributions to the farmland by expending money and labor improving the property—improvements which increased the value"). We accordingly affirm the resulting equalization payment.

## III.    Attorney Fees

Lastly, Colleen asks that we award her appellate attorney fees. Appellate attorney fees are awarded at our discretion and are not a matter of right. *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). When determining

---

[3] In defending the district court's property division, Colleen mentions that "[b]oth parties likely commingled their respective contributions to the marital home such that the entire home should be equally divided." But she then states "that giving Phillip a $25,000.00 offset and her a $7,000.00 offset is sufficiently equitable, such that the trial court's ruling could remain undisturbed." With that concession, and Colleen's agreement at trial to set aside $25,000 of the home's value to Phillip, we decline to consider this passive argument.

whether to award appellate attorney fees, we consider the needs of the party seeking the award, the ability of the other party to pay the fees, and the relative merits of the appeal. *McDermott*, 827 N.W.2d at 687. Upon considering those factors, we deny Colleen's request.

**AFFIRMED ON APPEAL AND CROSS-APPEAL.**